J. McCLURE KELLY PLUMBING COMPANY v.
MINNEAPOLIS HOUSING AND
REDEVELOPMENT AUTHORITY AND OTHERS.

231 N. W. 2d 289.

June 20, 1975—No. 45404.

*Feinberg, Meyers, Schumacher & Schumacher* and *James J. Schumacher*, for appellant.

*O'Brien, Doherty, Hoium & Lamm* and *Eugene A. O'Brien*, for respondent plaintiff.

*Carlsen, Greiner & Law, Peter F. Greiner*, and *Timothy M. O'Brien*, for respondent Adolfson & Peterson.

Heard before Otis, Todd, and Yetka, JJ., and considered and decided by the court en banc.

YETKA, JUSTICE.

Defendant and third-party plaintiff, Minneapolis Housing and Redevelopment Authority (HRA), appeals from denial by the Hennepin County District Court of its alternative motion for amended findings or a new trial. We affirm in part, reverse in part, and remand for a new trial on the issue of HRA's liability for the cost of repairs in the east wing of its Housing Project No. 2-25.

Plaintiff, J. McClure Kelly Plumbing Company, was the mechanical (plumbing and heating) contractor of Housing Project No. 2-25 (hereinafter called the project) developed by HRA. The firm of Bettenberg, Townsend, Stolte & Comb, Inc. (hereinafter BTSC) was the architect of said project; Adolfson & Peterson, Inc. (hereinafter A & P) was the general contractor; and Ericksen, Ellison and Associates, Inc. (hereinafter Ericksen) was retained as the mechanical engineer.

During the months of January and February of 1970, at which time the project was still under construction, some heating pipes

and water pipes in the building were frozen on two separate occasions. In both cases, plaintiff repaired the damage and thereafter submitted an invoice to HRA in the amount of $10,922.39 for that work ($10,297.64 for the first freeze; $624.75 for the second freeze). HRA's refusal to pay plaintiff's invoice gave rise to the instant litigation.

Plaintiff brought action against HRA, BTSC, and A & P seeking payment of $10,922.39 for labor and materials required to effectuate the aforesaid repairs. Eventually the action involved five parties, which by stipulation were aligned as follows:

(1) Plaintiff v. HRA.[1]

(2) HRA (as third-party plaintiff) v. BTSC and A & P (as third-party defendants).[2]

(3) BTSC (as fourth-party plaintiff) v. Ericksen (as fourth-party defendant).[3]

On March 25, 1974, this matter came to trial before the court, sitting without a jury. In its findings of fact, conclusions of law, and order for judgment, the court found HRA liable to plaintiff in the amount of $10,922.39, plus interest and costs. BTSC was found liable to HRA in the amount of $624.75, plus interest and costs. Ericksen, in turn, was found liable to BTSC in the latter amount. A & P was granted judgment of dismissal.

Thereafter, HRA moved for amended findings of fact, con-

[1] This phase of the litigation was predicated upon plaintiff's original complaint.

[2] This phase was predicated upon HRA's contentions that BTSC negligently designed the building and negligently supervised and inspected its construction, and that A & P was negligent in the construction and insulation of the building, thereby causing the pipes to freeze. Thus, according to HRA, any liability for the frozen pipes should rest with BTSC and A & P.

[3] This phase was a claim for indemnity against Ericksen should BTSC be found liable in the above action.

clusions of law, and order for judgment, or, alternatively, for a new trial on all issues. That motion was denied and HRA appealed.[4]

Although the instant litigation involves two separate incidents wherein the pipes of the project were frozen, this appeal concerns only the first such incident, which occurred on or about January 7, 1970.[5]

On January 30, 1968, plaintiff entered into a contract with HRA as a mechanical contractor to perform the installation of the plumbing and heating system of the project.

The building constituting the project consists of two wings. The west wing contains 144 residential units, along with the boiler room which is the source of heat for the entire structure. Boilers in the boiler room heat water which is then circulated throughout both wings by electric pumps. There are three such pumps; one serves the west wing, one serves the east wing, and one serves as a standby which may, by manually controlled valves, be utilized to serve either wing.

Construction on the project progressed to a point at which, on September 19, 1969, HRA "accepted" the west wing portion of the building.[6] The specifications made part of the contract between HRA and plaintiff provided, in part:

"The Local Authority shall assume risk of loss with respect to any area occupied by it under the terms of this agreement; provided the contractor shall assume full responsibility for loss

---

[4] By order of this court dated November 12, 1974, the appeal as to BTSC and Ericksen was dismissed with prejudice.

[5] The liability for the $624.75 for the second freeze ultimately was found to rest with Ericksen, which is not a party to this appeal.

[6] On that date, HRA executed a "memorandum of acceptance," which provided that "[t]he Contractor will be relieved of responsibility for performing further work or supplying further materials, equipment, or other items * * *."

of damage traceable to his fault or negligence in the performance of his contract."[7]

The west wing was thereafter occupied by tenants.

Construction on the east wing continued into January 1970. There was testimony that the general contractor, A & P, had a considerable amount of caulking to finish, as well as some insulation to install. Most of the unfinished caulking was in the east wing.

Plaintiff's work had been virtually completed in the west wing prior to January 1970. Additionally, the president of plaintiff company testifed that the heating system in the east wing had been virtually completed prior to the first freeze on January 7, 1970.

On January 5, 1970, an HRA building custodian discovered that the heating pump for the west wing had been switched off. However, the east wing pump was running at that time. In a short time the west wing pump was switched on, and there is no direct evidence of record of any subsequent pump stoppage.

On January 6, 1970, there were no apparent heat problems in the building. However, on the next day the custodian discovered that a domestic water pipe had ruptured in the west wing.[8] He also discovered pipe leaks in the east wing.

The major ruptures in the east wing were in a heating pipe near the laundry room and in a coil of an air heating unit in the basement of the building.

In addition to the single rupture of the domestic water supply line in the west wing, other pipes, according to uncontroverted testimony, had frozen without rupturing in that part of the building.

[7] There was no evidence of record that plaintiff was guilty of any negligence in the performance of its contractual duties or in making repairs to the frozen pipes.

[8] This rupture occurred above an open walk, i.e., an open space that goes right through the west wing at ground level.

At trial, plaintiff's president, LeRoy Kelly, testified that his office received a call, from an unspecified person, informing them of the frozen pipes and giving oral instructions to commence repairs immediately. Plaintiff immediately commenced around-the-clock repairs of the damage in both wings.

On January 13, plaintiff received a letter from BTSC which stated in part:

"* * * [E]ach prime contractor is hereby directed to proceed at once with the repair and/or replacement of all damaged work within the scope of his contract. * * *

"Until such time as the actual cause of this damage is determined, we recommend that each Contractor keep a separate record of labor and materials involved in such repair and/or replacement work."

There is credible evidence in the record that this letter was sent at the behest of the HRA project construction coordinator.

The repair work was subsequently completed. However, plaintiff was notified by HRA, in a letter dated January 12, 1971, that his claim for compensation for effecting the repairs was denied, since:

"1. That portion of the building where ruptures occurred [east wing] had not been accepted by the Authority [HRA].

"2. Under Section 26 of the General Conditions—Care of The Work, it is the responsibility of the Contractor, not the Authority, to furnish continuous protection to the building."

Section 26 of the general conditions of the contract between plaintiff and HRA was read into the record as follows:

"Paragraph A: The contractor shall adopt reasonable methods during the life of the contract to furnish continuous protection to the site and to the work, materials, and equipment thereon to the end that loss or damage may be prevented. He shall refuse entry to persons not having business on the site. He shall be responsible for all damages to persons or property, that occur

as a result of his fault or negligence in connection with the prosecution of the work and shall be responsible for the proper care and protection of all materials delivered and work performed until completion and final acceptance, whether or not the same has been covered by partial payments made by the Local Authority, and whether or not the damage to his work was caused by the contractor or by other contractor or by other employees of the Local Authority in the course of their employment."

Throughout the trial, considerable testimony was elicited as to the *cause* of the freeze-up. Most witnesses agreed that a stoppage of circulation of warm water through the pipes, coupled with extremely cold weather, was the cause. There was also testimony that open or uncaulked joints and openings could have been a factor.

There is no evidence of record that the amount charged by plaintiff for the repairs at issue is unreasonable, and appellant admitted at oral argument that the amount of the repair bill is not an issue in the case. Moreover, there is no question that HRA has benefited from those repairs. The major question is upon whom the burden for the damage should fall.

The issue raised by this appeal is whether the record supports the trial court's finding that there was no liability for the repairs on the part of either plaintiff or third-party defendant A & P.

The trial court found the boiler room to be within the sole control of HRA at the time of the freezings. The court implicitly found pump stoppage to be the cause of the pipe freezings, found that HRA did not maintain control of the boiler room, and found that this failure to control the boiler room was ultimately the cause of the damage. Based on these findings, the court concluded that the responsibility for the damage rested with HRA. Moreover, the trial court found that there was no proof to support any claim against A & P.

HRA vigorously asserts that these findings are not supported by evidence in the record. HRA contends that the trial court's findings with respect to control are clearly erroneous because

HRA did not have control over the boiler room. This argument ignores the existence of the fact that it had "accepted" that portion of the building prior to the date of freezing. Moreover, there is evidence in the record that plaintiff's employees did not have keys to the boiler room.

There is also evidence to support the trial court's finding that the frozen piping in the west wing was caused by pump stoppage because there was direct testimony that the west wing pump was not operating at a time prior to the date in question.

In summary, upon a thorough review of the record, we hold that the findings upon which the court determined that appellant was liable for the cost of repairs for the west wing were not "clearly erroneous."[9] Those findings are affirmed.

Even though this court has traditionally accorded great deference to findings of fact of a trial court, its finding as to the cause of the pipe freezings in the east wing lacks evidentiary support in one very critical area. The court found the cause to be pump stoppage. However, there is no evidence that the pump serving the east wing was not operating at any time herein relevant. In fact, there was direct testimony given at trial that

---

[9] The scope of review under Rule 52.01, Rules of Civil Procedure, of findings made by the trial court has been defined as follows:

"* * * The 'clearly erroneous' rule is incapable of precise definition. However, as it has been applied both by the Federal courts and by this court, the rule, identical for both court systems, clearly establishes a broader scope of appellate review than that applied when the court is reviewing findings of a jury or of an administrative tribunal. * * * Indeed, the scope of review under this rule may now be regarded as the broadest exercised by an appellate court for, even though there is evidence to support a finding, the finding can be held to be clearly erroneous if 'the reviewing court on the entire evidence is left with the *definite and firm* conviction that a mistake has been committed.'" (Italics supplied.) In re Estate of Balafas, 293 Minn. 94, 96, 198 N. W. 2d 260, 261 (1972).

However, this court must give due consideration to the trial court's opportunity to judge the credibility of witnesses. In re Estate of Lea, 301 Minn. 253, 222 N. W. 2d 92 (1974).

the east wing pump was operating at all times. Since the finding that pump stoppage was the cause of the damage has no evidentiary support with respect to the damage in the east wing, that finding is clearly erroneous as it relates to such damage. HRA cannot be found liable for damage to the east wing on the basis of the record in this case.

The specifications and general conditions of the project, made part of the contracts between HRA and BTSC and between HRA and plaintiff, are not in the record on appeal, even though portions of those documents have been cited in the briefs and at oral argument. The cited portions of the contracts, however, indicate some responsibility in the contractors and subcontractors to supply temporary heat and protection to those portions of the building under construction and not accepted by the owner. HRA had never accepted the east wing of the building, and, thus, there is doubt as to whether HRA or the contractors were responsible to maintain and monitor the heat in that portion of the building. Although the record refers to pressure gauges controlling the boilers and the heat pumps, which appellant theoretically should have constantly monitored, it is not clear what controls existed in the boiler room.

Since we find that HRA is liable for west wing repairs but possibly not for the repairs to the east wing, a new trial is required with respect to the issue of HRA's liability for the latter.

The trial court found that there was no proof to support any claim against respondent A & P. Since it has been satisfactorily proved that HRA is liable for the west wing damage, on this appeal we need only consider A & P's potential liability for east wing damage.

It is uncontested that at the time of the pipe freezings, there was considerable caulking left to be done in the east wing by A & P. So, also, is there considerable evidence that insulation was missing in certain areas, contrary to building specifications. Moreover, there was credible testimony that such lack of caulking and insulation could have been a contributing factor to the

damage to the pipes. Since the trial court's finding as to causation of damage in the east wing is erroneous, and since there is little evidence, other than the "care of work" clause in the contract, to establish liability in plaintiff for the east wing damage, the trial court's finding in regard to A & P should be vacated so as to allow plaintiff the option to seek recovery from A & P for work expended to repair the freezing damage in the east wing.

The trial court characterized the instant litigation as "mixed up." Indeed, that observation was an understatement. The entire transcript of the trial is replete with the confusion that arises when there are five parties participating in the litigation of three causes of action at one trial.

Upon retrial, the trial court must determine some basic questions:

(1)  What caused the damage in the east wing?

(2)  Whether the contract documents among the various parties to this lawsuit required A & P and plaintiff to assume responsibility for adequate heat in the east wing of the building. (These documents should be made a part of the record and if this matter again comes before this court, said documents should be submitted with the record for this court's consideration.)

(3)  If it is determined that the damage in the east wing was caused, in whole or in part, by pump stoppage, whether the boiler room had sufficient pressure gauges, switches, and other monitoring equipment so that HRA agents could have discovered the heat pump failures through proper periodic inspection; and, if so, whether HRA had a duty under any theory of law to have made such inspection and thus to have prevented the damage in the east wing.

(4)  The cost of repairs between the east and the west wing should be properly segregated and itemized. This is particularly important if it is determined that HRA is not found liable for all or part of the cost of the east wing repairs.

Affirmed in part, reversed in part, and remanded for a new

trial on the issue of HRA's liability for the cost of repairs in the east wing.

MR. JUSTICE MACLAUGHLIN took no part in the consideration or decision of this case.